David M. WILLIAMS, Appellant,

v.

STATE of Alaska, Appellee.

No. 5676.

Court of Appeals of Alaska.

Oct. 8, 1982.

Christine Schleuss, Asst. Public Defender, William Morse, Asst. Public Defender, Dana Fabe, Public Defender, Anchorage, for appellant.

Charles M. Merriner, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Wilson L. Condon, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

OPINION

SINGLETON, Judge.

On July 31, 1980, David M. Williams was convicted of sexual assault in the first degree, AS 11.41.410(a)(1), assault in the second degree, AS 11.41.210(a)(2), and kidnapping, AS 11.41.300(a)(1)(E). On October 6, 1980, he was sentenced to twenty years on the charge of kidnapping, with five years suspended, ten years on the charge of

sexual assault in the first degree, and five years on the charge of assault in the second degree, all running concurrently. Williams raises three issues on appeal: (1) his right to due process was violated when the trial court admitted evidence of a photographic lineup made at a time when he was in custody; (2) the trial court erred when it refused to give defendant's proposed jury instruction that eyewitness identification testimony should be viewed with caution; and (3) his sentence was excessive.

We find no error and affirm.

Shortly before midnight on February 24, 1980, D.N., while seated at a table in a Kodiak tavern, was approached by David Williams and asked to dance. D.N. agreed and after one full dance Williams, at her request, joined her and others at their table for fifteen to twenty minutes before returning to his own table. It is agreed that they danced together on one more occasion during the early morning hours of February 25, 1980.

D.N. relates that she left the tavern between 3:00 a.m. and 4:00 a.m. with three acquaintances. After dropping off her final passenger, she began backing out of the parking lot when, in her rearview mirror, she observed a man, whom she identified as Williams, with a knife in hand, climbing over the back seat of her car toward her. Seating himself next to her he said, "Drive or I'm going to kill you." D.N. complied, but upon coming to a stop sign she attempted to jump out of the vehicle. The assailant pulled her back into the vehicle, again threatened to kill her and, applying pressure to the knife, cut her neck. As she continued driving, he unbuttoned her blouse, rubbed her breasts, and directed her to park among some Sea Land vans. After she parked the vehicle, he ordered her to take off her clothes and she again attempted an escape. The assailant grabbed her by her hair and, threatening to kill her, pulled her back into the vehicle. Both disrobed and the assailant attempted sexual intercourse. He was unable to effect full penetration and, subsequently, agreed to D.N.'s suggestion that they go to her apartment.

The assailant drove and enroute continued to make life threatening statements.

Arriving at the apartment D.N. made another unsuccessful attempt at escape, followed by more life threatening statements by her assailant. As they entered the apartment she began to scream. He pulled her into the bedroom, clasped his hand over her mouth, and threatened that if she did not shut up he would kill her. After being instructed to disrobe, she ran toward the door and a struggle ensued during which she was choked and struck repeatedly. He then told her that they had to leave the apartment and led her into the hallway where D.N. made another attempt to escape. Another struggle began during which she was struck repeatedly. However, on this occasion she was able to elude her pursuer by running to the safety of another apartment.

At 5:11 a.m. the police were summoned and, accompanied by D.N., inspected her vehicle. Inside of the vehicle they observed her blouse, black brassiere, and the shirt worn and left by her assailant. The clothes were left in the vehicle and the vehicle was left unlocked.

Shortly after 6:00 a.m., based upon a description given by D.N. of her assailant, two police officers arrested Williams as he walked "quickly away from the front door" of D.N.'s apartment building. He was wearing the shirt that had been identified as the assailant's and left by the police in D.N.'s unlocked car, and had the blouse and brassiere stuffed into one of his jacket pockets. Also, in Williams' possession was a folding Gerber knife and a cassette tape identified as having been in D.N.'s vehicle the morning of the crime. During the booking process Williams asked the officer who had emptied his pockets whether a knife, described by Williams as "a little silver thing; the sides were broken off of it, a small nail file type," had been found. Later, on the day of arrest, a knife matching that described by Williams was found lying on the D.N. vehicle floor.

` Approximately 24 hours after Williams' arrest, the police were instructed by the

district attorney to take photographs of men who closely resembled Williams. A few hours later D.N. was presented with a series of six photographs. The officer told her that the picture of the suspect may or may not have been in the grouping and that she was to pick out her assailant or the two pictures that most closely resembled him. She immediately identified the photograph of Williams and testified later that there was no doubt in her mind that the representation was that of her assailant.

At trial Williams moved to strike the identification. He urged that, given the fact that he was in custody at the time and there were no exigent circumstances, his right to due process was violated when a black and white photographic lineup was used instead of a corporeal lineup. The court initially denied the motion as premature and later denied it altogether.

Williams also proposed that the court instruct the jury according to the Model Special Instructions on Identification, adopted by the District of Columbia Circuit of the United States Court of Appeals in *United States v. Telfaire,* 469 F.2d 552 (D.C.Cir. 1972). However, with the exception of the first paragraph which was given, the proposed instruction was denied.

■ We agree with Williams that photographic showups are susceptible to manipulations and should be closely scrutinized where a trial identification is challenged on the ground that it was the product of a suggestive pretrial photographic lineup. In this case, however, Williams did not contend at trial that D.N.'s identification of Williams was the product of a suggestive photographic lineup. Given the totality of the circumstances such a claim would be impossible to sustain. *See Cox v. State,* 575 P.2d 297, 304 (Alaska 1978). We decline to accept Williams' suggestion and adopt a *per se* rule precluding an in-court identification by a victim who had previously viewed a

photographic lineup if the defendant is in custody at the time of the lineup. *See Viveros v. State,* 606 P.2d 790 (Alaska 1980).

■ We find no error in the court's refusal to give more than the first paragraph of the instruction recommended in *United States v. Telfaire,* 469 F.2d 552 (D.C.Cir. 1972). Viewing the instructions as a whole we are satisfied that the jury was properly instructed on the issue of identification. *McGee v. State,* 614 P.2d 800 (Alaska 1980), *cert. denied* 450 U.S. 967, 101 S.Ct. 1485, 67 L.Ed.2d 617 (1981); *Dayton v. State,* 598 P.2d 67 (Alaska 1979); *Buchanan v. State,* 561 P.2d 1197 (Alaska 1977).[1]

■ Finally, we do not believe the sentences imposed were clearly mistaken, *McClain v. State,* 519 P.2d 811, 813–14 (Alaska 1974). Williams' sentence of twenty years with five suspended for kidnapping is consistent with the twenty years with no time suspended we approved in *Davis v. State,* 635 P.2d 481, 488 (Alaska App. 1981). Davis and Williams were first offenders with exemplary military records. While Davis had apparently made abortive attempts on two other women prior to the rape and kidnapping for which he was sentenced, Williams' actions toward D.N. were substantially more violent. Most significant in our opinion, Williams was not willing to release D.N. even after completing his successful sexual assault.

Given an appropriate sentence justifying fifteen years incarceration for kidnapping, we do not believe a ten-year concurrent sentence for sexual assault clearly mistaken. *Compare Waters v. State,* 483 P.2d 199, 201–02 (Alaska 1971) (while a ten-year sentence for cocaine sale might have been excessive viewed in isolation, it was not clearly mistaken in light of concurrent five-year sentence simultaneously imposed for armed robbery). Here defendant's sentence of incarceration was equal to the presumptive sentence for a second offender. *Compare*

---

1. We note that the trial court gave an instruction based upon Lord Hale's dictum that rape is a charge easily made and difficult to defend against. The supreme court specifically disapproved that instruction in *Burke v. State,* 624

P.2d 1240, 1254–55 (Alaska 1980); nevertheless, where it is given it serves to protect the defendant against a faulty eyewitness identification. *Compare Bakken v. State,* 489 P.2d 120, 127 (Alaska 1971).

*Austin v. State,* 627 P.2d 657 (Alaska App. 1981) (while normally a first offender should receive a more favorable sentence than a second offender, the rule is not absolute when the record supports imposing a greater sentence). While Williams did not use a firearm or cause serious physical injury to D.N., the manner in which he used his knife to cut her throat, and his repeatedly choking her, bordered on the conduct described in AS 12.55.125(c)(1). *See Juneby v. State,* 641 P.2d 823 (Alaska App.1982). Viewed in isolation the sexual assault sentence might be too severe, but when considered in light of the kidnapping sentence to which it could have been made consecutive, it is not in our opinion clearly mistaken. *Compare Davis v. State,* 635 P.2d 481 (Alaska App. 1981).

Finally, we do not believe the trial court violated the supreme court's admonition that refusal to admit guilt should not be held against a defendant who intends to appeal his conviction. *Christian v. State,* 513 P.2d 664, 670 n.6 (Alaska 1973). Williams did not merely fail to admit guilt but testified to facts which, in light of the other evidence and the jury's verdict, we must assume were untrue. The court properly considered Williams' false testimony in determining his amenability to rehabilitation. *Campbell v. State,* 594 P.2d 65, 67–68 (Alaska 1979); *Davis v. State,* 635 P.2d at 487.

The judgment and sentence of the superior court are AFFIRMED.